The following cases are scheduled for argument this morning, Wednesday, September 25, 2024. Case number 23-2884, case number 23-3009, case number 23-3140, case number 23-3218, all from the District of Northern Iowa, United States v. Derek Mims, David Belton, Anton Whitney Jr., and Elmer Mims v. Jennings. Thank you. In the first case, we have a number of appellants, and I understand there's been some discussion about the allocation of time. Could you describe to me what you all have agreed to? Your Honor, I can do that since I'm going first. I believe... You're Mr. Goldensoft? I am, Your Honor. Your Honor, I believe all of us have agreed to essentially take seven minutes, with six being part of the, hopefully being just the oral argument, with one minute in reserve. But we do have essentially two minutes in reserve after that, so if any of us do need additional time, it sounds like we might be able to get it. Is that correct? Yes. So six minutes per appellant, and a minute of rebuttal per appellant? Yeah. Ideally.   All right, Mr. Goldensoft, if you're prepared, please proceed. Thank you, Your Honor. Your Honor, as you indicated, I represent Mr. Belton. Now, Mr. Belton and his co-defendants were all charged essentially with a drug conspiracy in Cedar Rapids. He eventually pled to conspiracy to distribute and fell into possession, was sentenced to 396 months. In my brief, I briefed two issues, one related to the wiretap used in the case, and the other one related to an automobile search. Some of my colleagues are going to be touching on the wiretap, and I'm the only one with the automobile search, so I'm going to focus in on that. The first thing, I want to talk quickly about the facts. So essentially what happened is there was a vehicle that was being transported through multiple states, and the automobile transporter had suspicions about this Volkswagen Passat that was on this trailer. And so when he was in New Mexico, he contacted the police, essentially, and ultimately consented to search of that vehicle. My argument was that he didn't have the authority to provide that consent. Now the first issue is standing, whether or not my client had standing. The argument or the district court said that my client didn't have standing because there was no indication that he owned or possessed the vehicle. What evidence is there in the record that he had an ownership interest, and what evidence that he had a possessory interest? He had a... So the evidence is in the vehicle there were two registration cards. Now they have both... They were expired though, right? They were expired, Your Honor. There was also a, what do we call it, an incomplete renewal and report of deposit of fees. Now that had been expired too, but that was the latest sort of indication of any sort of ownership because that was from June 11th of 20, and it reflects that the registered owner was Mr. Belton. There was no other indications in there that there was ownership to someone else other than some insurance cards, but I would note that those insurance cards essentially overlapped what was... Was there anything in the vehicle at the time of the search that would have alerted anyone of your client's interest in the vehicle? Just those items that I've identified. Those weren't current, but it would... While they weren't current, they certainly do show that he had... I would argue he has... They show that he used to. There was no other indication that he didn't have possessory interest at that time. What about the fact that the hauler's got the possession of the vehicle, he's got the keys to it, and there's a case law from our circuit that does say that there's no reasonable expectation of privacy once you've given the keys to a vehicle, and the vehicle has to be driven. See, that thing's not going to levitate onto that car mover, so he's going to have to drive it. How come there isn't a presumption of the ability to consent under Gomez and Crowder? Well, so with regards to Gomez, I would argue that that's... Well, I believe Gomez primarily... Well, Your Honor, what occurred in this case is that there was a contractual relationship. The auto hauler had the ability to drive the vehicle on and off the ramp, but he didn't have the ability to drive it cross-country and pack his clothes in there and drive it wherever he wanted to. He just had a very limited relationship with that vehicle. I would argue that limited relationship wasn't enough for him to grant consent to a search of the entire vehicle. Perhaps if there was something in plain view... That's a step beyond your client having standing. I'm not sure you've made a strong enough case that your client has standing to assert the absence of consent. Yeah, I believe I have, and I guess I was... What's your best case that the items you mentioned, expired registrations, are the type of thing that would establish standing? Yes. What's your best case? Well, Your Honor, I would argue that those items do... Based on what authority? Just the fact that they show that he had some accessory interest in that. What if there was something ticking in the car, and the hauler thought, boy, that could be a bomb. I better call out the bomb squad. Are you saying that he couldn't consent to a search, even though it would endanger him? I know that's not this case. There's no bomb, but I'm throwing that out, because it tests your argument. Sure. I guess what I would say is that that would be a plain view situation, where... I can't see the bomb. Right, right. But you can hear it, and so that's plain hearing, I guess, instead of plain view. So I think under those circumstances... Now, I would argue that if there was methamphetamine in the backseat, and when he hauled it onto the trailer and hauled it off, he saw that methamphetamine there, yeah, he can agree to consent at that point. But the methamphetamine was ultimately found in a secret compartment that the cops had to dig into the car to actually access. So that sort of consent, I would argue, is completely different than your example.  So what about probable cause here? Secret compartment. He kind of knew that this was suspicious. There's a secret... And we're kind of moving on to probable cause on the automobile exception. I guess the first question is, did the officer, the Department of Homeland Security officer, did he have the ability to walk around the car, in your view? Yeah. I guess he could have walked around the vehicle. Looked under it. Sure. But, Your Honor, I guess I would argue that with regards to the automobile exception, that exception was carved out because vehicles are movable. Occupants of the U.S. Supreme Court in Chambers v. Moroney just identified that because vehicles are movable and once the police are there, the occupants are alerted so they can move the vehicle. In this situation, the person with the vehicle was obviously cooperative with the police. The police could have obtained a search warrant at that point and searched the vehicle. Can I ask a couple of follow-up questions? Do you agree, though, that there was probable cause after looking under the car and all that? Because you didn't necessarily make that argument. I didn't, Your Honor, because my primary focus with regards to that is if he did have probable cause, why didn't he go get a search warrant? And you're aware then that the Supreme Court, I tend to agree with you, that was the basis for it, but then the Supreme Court has expanded it out over the last 20 years and basically said, well, you know, even if you can't move the car or even if no one's there to drive it away, you still can go ahead and search it. I would argue that the Supreme Court has said that you may, under those circumstances, in certain circumstances, you may still do the automobile search, but I think it's still very factually based. The government cited Katie V. Dombrowski. In that case, what had occurred is that there was a drunk driver, caused a crash, and he had mentioned that he was a police officer from Chicago, and the other police officers conducting the investigation thought, oh, Chicago police officers always carry a firearm. Where's that firearm? We want to secure it so it doesn't end up in the wrong hands, and so they conducted the search, and the Supreme Court said, under those circumstances, the automobile search was fine. Thank you. Thank you, Mr. Gold. Mr. Mahmoud. Good morning. My name is Dave Mullen, and I was appointed to represent Derek Mims, both at the district court level and for purposes of appeal. Mr. Mims pled guilty pursuant to a written conditional plea agreement to count one, the conspiracy charge, reserving expressly the issues of recusal and suppression of the wire taps. Regarding the recusal issue in this case, law enforcement approached then-Judge C.J. Williams and asked them to review various search warrant applications. The judge made probable cause findings, necessity findings, and issued those warrants. They were then executed. Later, indictment was filed against various defendants, including Mr. Derek Mims. We had moved to file a motion to suppress the wire tap evidence, citing lack of probable cause and failure to comply with the necessity requirement. We also filed or joined in a motion to recuse Judge Williams, who was the issuing judge, from now reviewing his own work. Is it based only on the wire taps, the fact that he was the one who oversaw the wire taps and granted the warrants? Yes, Judge. Well, then what do you do? I mean, I guess my question is, what do you do about United States v. May, if you're familiar with that case, 70-F-4-10-64, which says that, essentially, there's no problem with the district judge who authorized warrants sitting on the case? Well, as Judge Williams, I'm not familiar with that case, Judge, but as Judge Williams put in his order, that there really isn't a decisional authority squarely on point where a judge issues the warrants and then later, wire tap warrants, and then is later asked to review on the sufficiency of the probable cause showing. Well, you know, that's, but there actually are two cases. There's May, but there's Jones that is actually a predecessor to Elton, and Elton doesn't bother to discuss Jones. That's at 801-F-2-304, you know, and if you look at those two cases, they stand for the proposition, essentially, that a wire tap application is an ex parte proceeding, and then the review is to a different burden of proof and has an evidentiary, the potential for an evidentiary hearing, and then a review of the affidavit itself, and then you review for providence, basically. Was the wire tap warrant improvidently granted? And as a guy who's done district court work, both on the state and the federal level, I mean, it seems fairly commonplace that judges review their own work on just exactly these types of warrant applications. I guess it is foundational to our system of justice that we have other judges review judges' works. I mean, this building, this court of appeals, circuit judges that work here, their job is to review the work of other judges, and there's a reason for it. Those same principles. But that's a different principle. I mean, the appellate principle is all based on the idea that once you've made a decision based on an entire record, the full record, and then it goes up on appeal, then, like, when I came from the district bench to the circuit bench, I was obviously disqualified on any case that I had made decisions on because those are final decisions based on the record as developed, right? And so I had knowledge of the case that I shouldn't have. I had an understanding of the facts that I wouldn't otherwise have, and I had opinions that I would never have otherwise formed.  But taking your Honor's example, had you not concluded that earlier case but were just in the middle of that case at the time of your elevation to the Eighth Circuit, we'd argue that that still would be an appearance of a conflict or impartiality there. It's not the finality of the decision that breeds the appearance of impartiality, but rather your exposure to it and having gone on record with your findings to then be asked to review the propriety of those findings. It's in that situation that we think this is distinguishable. Do you have anything beyond the identity of the judge to indicate there's some partiality or some bias? Absolutely not. The judge's order denying the recusal motion wastes an awful lot of ink and paper addressing an issue that was not raised by any of the parties in this case. There's no suggestion that Judge Williams is not a fair judge, quite the contrary. It's the appearance. It's how it looks objectively to people on the street to have the same judge reviewing his own probable cause determination on whether that strikes the average person on the street as fraught. In this case, it's exactly what the judge did. It was unnecessary. We did not ask the judge recuse himself from presiding over the trial or at sentencing or using the information he learned while a judge in the case. It's what he did before he became the judge assigned to this case. It could have been assigned to a different- Well, Judge, I'm on the 18th fairway of my legal career and it's high time that I make some new law here. With this panel's participation, we may be on the road. As Judge Williams cites in his order, it's really not clear what the law is in this area. We need, starting with the panel, to have guidance as to what judges should do in the  future. Should cases be assigned to a different district court judge if they were the ones who signed off on search warrants? And search warrants, not search warrants, wiretap warrants, these are rather uncommon. They're not like typical search warrants where the same principles apply. This is an unusual case. I can count on less than one hand the number of wiretap cases I've been involved in in 30 years in Cedar Rapids. Thank you. Thank you, Mr. Marlin. Mr. Sheets? Good morning. I want to follow up with the recusal issue. Regarding United States v. May, it did not address the issue that's presented today. In United States v. May, the defendant did not argue what we have this morning. The defendant, May, argued that the judge who presided over the granting of the search warrants and the wiretap warrants was so heavily involved in preliminary conduct and activity by which the court gained specific information about the defendant. And the defendant asserted that that familiarity required the judge to recuse himself. That's not what we're talking about today. There was no motion made by the defendant in May that the judge could not consider the suppression issue was whether the trial judge or the judge could preside over the trial. Isn't that, from the sounds of it, isn't that worse? Like, isn't that a case where it's perhaps more compelling and we held that it wasn't, there was no recusal required? What we have in this case, Your Honor, is Judge Williams was effectively reviewing an issue and a matter over which he had already passed judgment. Well, but it's not really a developed judgment. I mean, it's an ex parte proceeding, right? I mean, as a person who signed many warrants in my lifetime, but very few wiretap warrants, I'll concede that, that when they walk in and, you know, you're only getting one side of the story, you only have the facts that are put out in front of you and, you know, you take all of it with a grain of salt and you're really looking at this very discreet question, is there probable cause? Now, I know in the wiretap warrant we go probable cause plus, but it's still, you're just checking the boxes and you're saying, well, does the affidavit cover this? Does the affidavit cover that? Is the evidence reliable? But you're not weighing credibility because it's not contested and you don't consider facts outside of the warrant application because they're not there. If you think there's something else you need to do, you send them off and say you need more. Or you put the officer under oath and you ask questions and you make a record of it, right? I mean, and so it's not the same. It's not a reasoned judgment other than on the issue of have they met the standard of probable cause plus. Well, in this case and in most wiretap cases, the parties are limited to the four corners of the affidavit. There was no evidentiary hearing. There will not be an evidentiary hearing. So the court is looking at the exact same thing that it had looked at six months ago. Well, yes, but there's the opportunity to contest it. There's an opportunity to be heard. There's, you know, it's not the same. Is it? Well, there was no hearing in this case. It was all done on paper. And I think that's an important difference. The court had asked what authority, and I fully briefed this in my brief, what authority do we have that the remedy that we're asking for is the case be remanded and be reviewed by a different district court judge. The first authority that we have is the Alton case in which this court expressed doubts about the practice which occurred in this case. And it stated, quote, our affirmance in this case is not to be interpreted as approving it. I don't know how much clearer it could be. Well, that, yeah, but it's 32 years. Okay. At no point during that 32-year period has anybody come forward and said that the procedure is improper. And it's the procedure that's used everywhere. Well, I mean, I don't know. Maybe it's not used everywhere. What I do know is that it's used in the North Dakota state courts and it's used in the Minnesota state courts because I practiced in those courts. And I know that when, you know, in our district courts here, this is the same procedure. They are not ordinarily assigned to somebody else to review. I appreciate that. The second case that we would rely on is the Weddington case which comes from the Third Circuit. And in that case, I'm sorry, the Seventh Circuit. And in the Seventh Circuit, a state court judge ruled on a suppression issue. And then that same state court judge was then appointed to the federal district court bench. And as a federal district court bench, the federal district court judge reviewed the suppression ruling that it had issued a while as a state court judge. And the Seventh Circuit found that the appearance of impartiality was compromised. And that's exactly what we have in this case. And that's exactly why the court 32 years ago recognized that that is a practice that should not be encouraged. The absence of evidence of something doesn't mean that there's a saying in there. I can't remember what it is, but I don't agree with the court's statement that just because it hasn't been raised in 32 years doesn't mean it's not an issue. Perhaps the reason for it is because judges know and judges take a look at the Alton case where the court specifically discourages the practice and says, I'll pass this one on. That could be it. The reason why it doesn't happen, we have judges that are hundreds of miles remote from everyone in the district. I mean, when I was sitting in Fargo, you know, the closest judge was in a different division or different district. And, you know, it was 220 miles away to have somebody else review it. And I want to, the point is so important in this case because unlike other parties in the case, the co-appellants, in Mr. Whitney's case, the probable cause was not the strongest. The necessity, that second thing that the court has to find, was not the strongest. In fact, there was nothing mentioned about Mr. Whitney and the necessity prong. Nothing in the affidavit. And Judge Williams reviewed his own work and determined that it was good. Well, part of that is because it's a conspiracy, right? With a conspiracy, you're investigating everybody. And so you have to kind of look at it as a whole. You look at other people as well. And so even if it's true that with regard to Mr. Whitney, that maybe the evidence wasn't the strongest, you're still investigating the whole conspiracy at that point. Well, the warrant has to be particularized to the place or the person. That's the argument that we made in our brief, and I'd re-argue it this morning. But if he's a member, but it is relevant that if he's a member of a conspiracy, and other conspirators are talking about selling drugs and doing these things, and they know he's a member of the conspiracy, then of course, that is going to be probative on whether they, on probable cause as to him, don't you think? I'm going to use my last 30 seconds. I'm going to find it in my brief, and I'll respond to that if I might as well. Thank you, Your Honor. Thank you, Mr. Sheets. Mr. Bishop. May it please the court. I'm John Bishop. I represented Elmer Mims. Elmer was the sole co-defendant in this case that pursued a jury trial. And so I will begin my argument arguing the sufficiency of the evidence. Elmer was, or is, I should say, a 70-year-old individual. He's an individual that was three to four decades older than other members of this alleged conspiracy. And the evidence at trial indicated that Elmer Mims was both a user and distributor of marijuana. That's clear from the trial because at the end of law enforcement's investigation, a search warrant was conducted of his residence as well as other co-conspirators. And during the search warrant of Elmer's residence, law enforcement located four and a half pounds of marijuana that was vacuum packed, sealed in his basement. Other marijuana in the kitchen, including residue on a scale, some money, a money counter, things that are consistent with the distribution of drugs. But no methamphetamine to speak of whatsoever. No residue, nothing. In spite of the fact that the allegation is that he is guilty of conspiring to move pounds and pounds and pounds of methamphetamine. What about some of the statements that could be interpreted as dealing with drugs? For example, I think Elmer called Belton and said, quote, there's supposed to be 60 after 60 pounds of methamphetamine were seized. Couldn't a reasonable jury, and that's just one example. Couldn't a reasonable jury say, well, maybe it's not the strongest, but it's good enough to say it's part of the conspiracy for math. So that conversation is one of the last, I think, the final conversation. There's a handful of phone conversations. And essentially the case is, the case against Elmer is entirely phone conversations. There's no witness that will say, I sold it to him, I bought it from him, I've seen him with it, I conspired with him. There's no witness to say those things. That particular phone conversation is something that took place after the seizure. I get that, but part of it, I think part of what you see is that, as I said, Mr. Mims is 70 years old. He's someone that these individuals sort of looked up to and contacted for advice. And so in that circumstance, they're talking about, Mr. Belton knows what the conversation is about, but it's not clear that Mr. Mims knows what the conversation is about. And in fact, during that conversation, he makes reference to marijuana. It's not very often in these conversations that they make a specific reference to a drug, as drug distributors and conspirators don't say, give me some methamphetamine. But in this particular conversation, he actually did reference weed, where they're talking. The conversation is an argument over whether, in fact, the 60 pounds was seized. They don't believe it. They think that the guy who's driving the vehicle is lying about it, and somehow it's a trick to get the 60 pounds of methamphetamine. But in the conversation, there's no discussion of methamphetamine. The discussion, at least from Elmer's point of view, he says, I knew a guy once that had five pounds of weed taken from him. And he had all kinds of paperwork about the seizure. And the idea was that the guy who the methamphetamine was taken from should have some paperwork, and they were discussing as to whether or not he had any paperwork. But that only, I mean, maybe that works if they're talking even more abstractly. But the thing is, is he seemed to know about the 60 pounds of meth, which you would know or you could reasonably infer. You would only know is if he knew about it ahead of time, was told about it, may be part of the conspiracy, that type of thing. It's so specific as to the weight. Again, I think with that particular call, I understand what the court's driving at. However, we do feel like combined with what the physical evidence showed in this case, the only physical evidence that there ever was, was that Elmer was involved in marijuana. There's no witnesses to say he was ever involved in marijuana. There's only a handful of phone calls, and some of the phone calls actually also suggest that he's involved in marijuana. For instance, the first phone call that Elmer was ever on was December 1st, 2021. It's a conversation with David Belton. There's some confusion in the phone call. Ultimately, they say, well, it's decided on $1,800 per pound. And so the case agent in the trial says, well, they're talking about methamphetamine. Because that's consistent with the price of methamphetamine. Well, as direct, and this was during direct examination. As direct examination goes on, the officer says, by the way, it's also consistent with the price of marijuana as well. And so what you have is the jury hearing, well, they're talking about methamphetamine, when in fact, even in the phone conversation, it's marijuana or methamphetamine. Could it be meth and marijuana that they were talking about both? I guess that's speculation. I think our argument is simply that the jury is given this information that's entirely speculative. It could be, right? But the burden of proof is proof beyond a reasonable doubt. The government doesn't get to say, well, it could be talking about that. They have to prove that it did involve methamphetamine. We don't believe that a reasonable jury looking at the physical evidence in this case, gives the very limited phone tap information in this case. And as I said, some of the phone conversations suggest the conversation is about marijuana. That a reasonable jury couldn't come to that conclusion. Yeah, maybe it's possible, it's possible they were talking about methamphetamine. But there's no direct evidence in the case. So what I'm hearing is what all the old time criminal lawyers used to call equivocation. That when the evidence stands in equipoise, that it necessarily is insufficient to support the verdict, right? That if you look at it, could be this, could be that. One's criminal, one's not criminal. In this case, one's in the purview of the indictment. One's not in the purview of indictment. That it is insufficient as a matter of law. And I get that when it comes to this discussion about quantities and what is the actual drugs, you know? The issue that I really am still somewhat hung up with is that, even in your own words, you said that the other members of this conspiracy respected him and sought his advice. And advice and counsel to a conspiracy, if you know that the illegal operation is afoot, is sufficient to sustain a conviction for conspiracy. Understood, and as I said, in that final conversation, which is the one I characterized as being some sort of, hey, this guy's saying he doesn't have the paperwork, it's not clear that Elmer really knows what's being discussed. And as I say, in that conversation, he makes a reference. Hey, I knew a guy, they're talking about 60. And then he says, I knew a guy that had five pounds of weed taken, and he had all kinds of paperwork. And so he's trying to suggest to Mr. Belton, there should be some paperwork. And if there isn't paperwork, he's lying about it, this is all some sort of trick. But it's not clear that Elmer knows that the conversation is about methamphetamine, and it is, again, we feel just simple speculation on the part of the jury, they hear the case agent say, yep, they're talking about methamphetamine, even though it's not clear. And as I said, I would not characterize it as being an equipoise. We feel that the fact that he's found with this marijuana, and everything suggests he's the one getting marijuana, the government's witnesses- Wasn't there a conversation he had with Derek, and we're talking about getting a couple of elbows? There was. And Derek was known for selling meth. And, your honor, I appreciate the question. In that specific circumstance, the case agent said, well, I know that they, originally the case agent says, I know they're talking about methamphetamine, because Derek wasn't dealing marijuana. But then on later examination, the case agent had to back up and say, oh, yeah, you know what, he was selling marijuana at that time, because Chris Curley, who did testify in the trial, although he didn't remember this conversation, admitted that he remembered a conversation with Derek saying, I was planning to sell him 10 to 15 pounds of marijuana, and that happened six days after the conversation your honor's referencing. So again, there is this evidence that shows that Chris Curley, Derek Mims were selling marijuana, the conspiracy had marijuana in it, and Elmer was the one buying the marijuana. I see I'm out of time, but thank you for your questions and time. Thank you, Mr. Bishop. Mr. Chapman. May it please the court, counsel. I'd like to, there's a number of different issues here. We've had a lot of discussion here about a number of different things. I sort of want to start in reverse order, since that's freshest here, talking about Elmer Mims and the sufficiency of the evidence. I just want to clarify a few things. The, in particular, this question about the elbows, that was important evidence in this case. There was this series of phone calls that the defendant requested of Derek Mims' elbows, two elbows, he needed two elbows. And Mr. Bishop talks about the fact that, or says there's no physical evidence here, there's no witnesses that pointed at the defendant and said, I bought drugs from him, or I sold drugs to him. And that's true, the witnesses who were able to, who cooperated or who otherwise were involved in, were testifying in this case, did not know this defendant directly. But that sequence of calls, the witness on the stand, Chris Curley, testified that in that sequence of calls, he received the calls on the back end from Derek Mims, and the calls were all laid out. The defendant calls Mims, asks for elbows. Mims says, I don't have any. Then Mims calls Chris Curley to try to get some meth. Chris Curley testified that those calls were about meth. And that he ultimately supplied one pound of meth to Derek Mims, and you see the calls all the way back and forth down that. So that meth wasn't seized at the time, but the calls were clear, and the witness on the stand testified that those were about methamphetamine, not about marijuana. So it's true that there's not a direct witness that said, I sold him methamphetamine. But the other circumstantial evidence and the direct evidence in the defendant's own words from the wiretap calls were very clear that this defendant was talking about methamphetamine. Not only in that one pound, but also in the call about the 60 pounds after the fact. Mr. Bishop makes much of this notion that the defendant referenced actually said the word marijuana on that phone call. That's true, but in context, he was saying that as compared to, saying even five pounds of weed, you get all of this paperwork. And in this case, they had 60 of them taken, and he doesn't have a stitch of paperwork. The conversation was about whether this individual had cooperated or set him up, or whether he'd actually given it to the police as opposed to, or stolen it, as opposed to having it been taken, and he actually was in trouble for it as well. So that evidence was very clear that the defendant understood what the 60 was about. And the jury was certainly entitled to interpret the evidence in that way, especially in light of all the other evidence where this defendant had been in contact with major, major methamphetamine drug traffickers, specifically Mr. Belton and Derek Mims. Not to mention the call, there's a call between Derek Mims and David Belton, where they're talking to each other about setting themselves up for the future and they're going to get 150 pounds this next time because they've got such a great price on methamphetamine from PAPA, their source in California, and they say in that call that it's going to be 50 for me, 50 for you, and 50 for Unk, and Unk was Elmer Mims. So even in that phone call, which happened well before the 60 pounds were seized, the defendant was put on par as an equal partner in what they were getting, and the prices and everything were consistent with methamphetamine. Obviously, the agent also testified that it could be consistent with high-grade marijuana from California, but in the context of this particular conspiracy, it was clear that it was methamphetamine. The jury certainly was entitled to find that. Going to, I will touch base on the recusal issue, which both counsel for Mr. Whitney and counsel for Mr. Mims talked about. I will sort of suffice it to say that the court has, I think, keyed in on it here. United States versus May has decided this. This was actually a case that came out after the briefing in this case in the district court. So May sort of came after the court had ordered in our case, or issued its order on the recusal. I want to clarify one thing, though, that Mr. Sheets said. His read on May is that it was only talking about, that the motion to recuse was only about the trial because of all this other information that the judge had about these defendants. But I don't believe that's accurate. If you look at May, in the order of the facts, it states that May filed pre-trial motions. He filed a motion to recuse for all these bases. Then he filed a motion to suppress the wiretap, which is exactly the situation that would have happened here. And the motion to recuse was denied before, as my understanding, before the motion to suppress was ruled on. So it would have applied to the motion to suppress. It would have applied to the trial and everything else in that case. I understand that here the motion was made specifically with respect to the motion to suppress. But May, I believe, and its holding is very clear that recusal in this circumstance is not required. There needs to be some additional showing of prejudice or some additional showing of animus toward the party, and that wasn't made here. And as Mr. Mullen conceded, there's no allegation to that here. And so, on balance, May controls on that issue, and the district court should be affirmed on the motion to recuse. Next I will talk about Mr. Belton and the issues related to the car hauler. I believe the court is tracking the government's argument or where our position is on this. We believe on the first issue, the so-called standing or reasonable expectation of privacy issue, that there was no current indication in the vehicle that this defendant, that Mr. Belton had an existing property, either ownership or possessory interest over that vehicle. And it's actually even a little bit further than that, because when you look at sort of the total of information of what was in that car, we have these two expired registrations to Mr. Belton. We have the June 2020 notice that says there's some sort of problem with the registration you tried to make out in California because of some smog or air quality certification that he failed to, apparently had failed to file. So basically it's showing that, well, you don't have the registration here. Then we have the current insurance card in the vehicle belonging to two other individuals. And then there's the most recent indication of any ownership of this vehicle, interest of anybody, is that there is an application for registration in Iowa, but it's unsigned. We don't know, there's no name on it that can be read. So- Counsel, I wanted to ask you about this. This seems to me to be the weakest of the three government arguments, and I'll tell you why. Suppose, hypothetically, somebody leaves their car out on the street during a snow emergency or whatever. And what ends up happening is the car gets slapped, it gets towed, right? And then they look through there and there's expired insurance cards. But I come in, or whoever comes in and shows them, hey, here's my registration, here's my title, sorry it wasn't in my car. Do I not have a right to, just because my information's not in the car, do I not have a right to challenge that? Potentially you would, but there would need, typically in a situation like that, if you've got your car and you're driving it out on the street, you have a license plate on the car, you have registration. There's some sort of indication that this vehicle is tied to a particular person. In this case, there was no indication that this particular defendant was tied to that vehicle at all, at that time. No license plate that connected to him, like you could check the registration, it wasn't connected? There was no license plate on the vehicle. So, in that situation you're looking, as law enforcement, they're looking at a situation where the only evidence they have is there is a current, apparently a current insurance card, but it's not to the defendant. Well, let me ask you this. When is the appropriate time to make that determination? Is it what's in the car at the time, or can somebody come in later and say, hey, it wasn't in the car, but look at all the, you know, here's a stack of documents showing it's my car? Yes, I believe in order to, because this is sort of an issue of whether you can even get to the, whether the initial, or the further search was reasonable, or whether there's other basis for it. It's the defendant's burden to demonstrate his expectation of privacy. That happens in the court case. That happens in the criminal matter. So, if this defendant had come forward with some other evidence, could have testified and said, yeah, that's my car. Here's how it got on the hauler. Could have brought some other witness in, one of the individuals who was listed on the bill of lading, this Trey Finn or the Eric who was listed on the bill of lading as being the recipient. They could have come in and testified, oh, no, that was for David Belton. That's his car. None of that happened here. So, it's really a matter of evidence and burden here. It's the defendant's burden in order to be able to claim that he was aggrieved, that his constitutional rights were violated. He has to show that he has that reasonable expectation of privacy. And what he did here was rely only on the information that was in the car. And our position and the district court's position was that's just not enough. The last thing as far as prepared that I would talk about is, as far as in response to counsel's argument, is Mr. Sheets talked just very briefly, and I know his time was short, about necessity and the fact that the affidavit did not specifically refer to each and every law enforcement technique as having been directed at Whitney and what the results were of that. And that is, as the district court found, that is not the standard. The standard is whether looking at the entirety, whatever the purpose of the investigation was. And here, as Judge Strass, as you I believe correctly pointed out, we are talking about a situation where the investigators were investigating a large-scale drug trafficking organization. And so the question is, for purposes of so-called necessity, and that's a bit of a misnomer because the statute doesn't say that you have to prove that you needed to do the wiretap. It's you have to prove that, I've got the actual language here, you have to prove that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous. And that's what happened here. The affidavit describes this large-scale drug trafficking organization. It describes the probable cause section, describes all of sort of the different information that was gathered with respect to the particular phones and why those phones were going to be, there was a fair probability that those phones were going to have conversations occurring over them that were drug-related. But then the last section relates to, okay, now that we're looking, we have three different phones here. One for Mr. Belton, one for Derek Mims, and one for Mr. Whitney. Now the question is, in that context of what the purpose of the investigation is, are normal investigative procedures, have they been tried and failed? Or do they reasonably appear to be unlikely to succeed? And it's there that when we look at what the officers told the court at the time, or the officer told the court at the time, about control buys. Listen, we're talking about taking down an interstate, massive drug trafficking organization. Going and doing a single control buy from any single member of that organization is not going to get us the full picture here. This is a situation where only the wiretap was going to be able to get that picture. Doing a control buy from, or seizure of drugs from Mr. Whitney was not going to get the information about the California source. That only comes through intercepting calls with other individuals that will, as far as reasonably appear to be likely, the wiretap was required in order to get that. And that was the showing that was made, and that was appropriately where the district court rests its analysis. I wanted to ask about the necessity real quick, and kind of follow up on a different aspect of it, which is does the good faith exception, I know it's settled in this circuit, but I've sort of been thinking about this for a couple of days now. Does it make sense in this context, given that the inquiry is completely different? First of all, we're not applying the traditional exclusionary rule. But second, we're not just talking about probable cause. We're also talking about necessity. And there is no analogous requirement under the Fourth Amendment. It's only there because of the wiretap statute. So I know it does apply, but should it? And I don't know the answer to that. First, I'll say I agree that, yes, it does apply. Second, it should apply, because really when you think about the focus of the good faith analysis, it's about what does that officer have a good faith reason for doing. Was he doing what he was doing in good faith? So if you think about it in a wiretap context, this isn't fully part of the record, but I suspect it's known because we are required in a wiretap context to get department approval, and we have to show that to the court that we have department approval. So this is not any simple warrant in a state court where an officer can walk into a judge's chambers and have a short affidavit and go search a house. This is a situation where there are so many extra guardrails and procedures related to the issuance of this particular order that good faith in this circumstance is almost like even better good faith than you would have in the typical search warrant context, because the officer has gone not only through just a judge. He's gone through a department. He's gone through a U.S. attorney's office. Then he's gone to a judge, and there's been all of those checks before he actually takes any action on the warrant. But if the statute requires more, and I think you're right about that. The statute requires more. We've talked about some of that. I wonder whether the folks who wrote the statute and the plain language of the statute, we should allow sort of you to drive a Mack truck through all those extra requirements by saying, well, it's good faith. Like, you know, it's really hard to do this, and so I should have a good faith reliance. I wonder if that just goes the other way, to be honest with you. I can't say I've thought much about that particular question. I will sort of end where I started, then, I guess, is that this circuit is pretty clear that Leon good faith does apply in these contexts. Those are all of the prepared and responsive arguments that I have at this time. So I will ask if any member of the panel has any questions about any of the issues raised in the briefing. Otherwise, I will cede the remainder of my time. I don't see any. With that, I would ask the court to affirm in all respects. Thank you. Thank you, Mr. Chaffman. We had a mishmash of timing, but since we've got a little extra time, I'll give each of the appellate counsel a minute for rebuttal. You're on time. All right. Please. Mr. Moe. Okay. Five points and 60 seconds, Your Honors. First, there was some discussion of Derek Mims being known to be a distributor of methamphetamine. He has no record of being a methamphetamine. Prior to this case, criminal history is clear on that. The judge mentioned that at sentencing, this was a first-time involvement with methamphetamine allegation. While what happens in the state system with reviewing search warrants is it's helpful for the analysis, our motion was filed pursuant to a federal recusal statute. Third point, it is the law in the Eighth Circuit that water taps don't have to be the last tool of resort by law enforcement, but certainly the law is clear that it's not to be the first and certainly not the only tool used by law enforcement. Once they started down this path of wire tap, you see scant evidence. They went to go back and tried additionally to comply with the necessity requirement. With respect to Mr. Mims, there's an almost absence of anything other than the wire tap in this case. This is a conspiracy. There has to be limits on that. If it's a conspiracy of three people and you have satisfied the necessity on two of the three, yeah, maybe. Okay, but if it's a case of 100 co-conspirators and you try to get information the other way through two of them, is that good for the other 98 people? There's got to be some limitation here. This is a case involving 11 defendants and nothing other than the time of the wire taps against Mr. Mims. As far as good faith, the only other I would add to that, Judge, is can the actual law enforcement who provides the information claim the defense of good faith? I mean, isn't that a little bit like Captain Reneau in Casablanca being shocked, shocked that there was no necessity requirement that was complied with here when it was his own affidavit that left the holes in the necessity requirements? The same thing goes with the Fourth Amendment, though. I mean, the person writes the affidavit, probable cause, and you still apply the good faith exception. Yeah, I'm not saying it announces it there, but in this case, it's not other officers relying on a third officer's submitting of affidavit. This is his own information provided to the court, and if it's lacking, he has the knowledge of what's lacking because he's the one who did or didn't do the various other investigative tools that were available to him. Thank you. Thank you, Mr. Mullen. Mr. Sheets. Thank you, Your Honor. Your Honor, I first want to follow up. I did look at my brief in regards to Judge Strauss's question about does necessity, can it just be implied to everybody because it's a conspiracy case. And in my brief at page 38, I cited two cases in which the Ninth Circuit found that that was not the case. There must be a particularized showing for each person's individual phone, which in my case, there was absolutely no mention of necessity in regards to Mr. Whitney anywhere in the affidavit, 100-page affidavit. The government responds by saying, well, the Ninth Circuit isn't binding on this court. True, but it certainly does carry weight. In regards to, there was a question about the recusal, about Jones. Why doesn't Jones still apply? And as I stated in my brief at page 49, Jones predates the enactment of Moran v. Clark in which the Eighth Circuit found there does not need to be actual bias. And in Jones at page 312 of the opinion, the court found that a recusal is not required because, quote, Jones did not show any specific facts indicating personal bias on the part of the judicial officer. After the Moran v. Clark case, that is not the standard. The standard is, is does it average person on the street? And when you look at the district court reviewing its own work, we would respectfully argue that the Eighth Circuit in 1992 had it correct when it stated that this is not the practice that should be done and should be followed. So we would ask the court follow that precedent. Thank you. Thank you, Mr. Sheets. Mr. Bishop? Your Honor, I have no additional rebuttals to offer. All right. The court wishes to thank all counsel, particularly want to acknowledge the service under the Criminal Justice Act of the attorneys for the appellant. The court appreciates your participation on the panel. And we thank you for arguing before the court this morning. We'll continue to study the briefing and render decision in due course. Thank you. Counsel may be excused. Madam Clerk, would you call case number two, please?